UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

THERESA VIOLA-LANISE HARPER,    )    CASE NO. 3:15CV1008
                                )
            Plaintiff,          )    MAGISTRATE JUDGE
                                )    GEORGE J. LIMBERT
     v.                         )
                                )
CAROLYN W. COLVIN[1],           )    MEMORANDUM OPINION & ORDER
ACTING COMMISSIONER OF          )
SOCIAL SECURITY,                )
                                )
            Defendant.          )

Plaintiff Theresa Viola-Lanise Harper ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her application for disability insurance benefits ("DIB"). ECF Dkt. #1.  In her brief on the merits, filed on August 26, 2015, Plaintiff asserts that the administrative law judge ("ALJ") erred by: (1) failing to give any weight to the disability decision of the United States Department of Veteran's Administration ("VA"), who found her 100% disabled (2) failing to give controlling weight to the opinion of her treating psychologist Dr. Wood, and (3) determining that she had experienced significant improvement since May 20, 2009 such that she was no longer disabled.  ECF Dkt. #12. Defendant filed a merits brief on September 24, 2015.  ECF Dkt. #13.

For the following reasons, the Court REVERSES the ALJ's decision and REMANDS the instant case for proceedings consistent with this Opinion..

I.    **PROCEDURAL AND FACTUAL HISTORY**

On August 30, 2013, Plaintiff applied for DIB alleging disability beginning on March 2, 1999, when she was forty-nine years old.  ECF Dkt. #10 ("Tr.") at 138.[2]  She alleged disability due

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found by way

to major depression, bipolar disorder, post-traumatic stress disorder ("PTSD"), irritable bowel syndrome ("IBS"), and arthritis in her knees and lower back. *Id.* at 147.  The SSA denied Plaintiff's application initially and upon reconsideration.  *Id.* at 82-98, 104-106.  Plaintiff requested an administrative hearing, and, on September 23, 2014, an ALJ conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). Tr. at 34-81, 110.

On November 10, 2014, the ALJ issued a Decision finding that from March 2, 1999 through May 20, 2009, Plaintiff's impairments met Listing 12.04. Tr. at 19.  However, the ALJ found that Plaintiff was not entitled to benefits despite being disabled during this time period under 20 C.F.R. § 404.315(a) because her disability ended four years prior to the date that she applied for benefits. *Id.* at 11-29.  The ALJ further found that beginning May 20, 2009, Plaintiff no longer was disabled because her impairments or combination of impairments no longer met or medically equaled the Listings, including Listing 12.04, because her condition had improved.  *Id.* at 21.  He thereafter found that Plaintiff had the residual functional capacity ("RFC") to perform medium work with the following limitations: the ability to understand, remember and execute only simple instructions; make judgments on simple work; respond appropriately to usual work situations and changes in a routine work setting with few and expected changes; interact with others on trivial matters defined as dispensing and sharing factual information not likely to generate an adversarial setting; and she should be precluded from work requiring high production quotas, such as piecework or assembly line work, strict time requirements, arbitration, negotiation, confrontation, or directing the work of, or being responsible for, the safety of others.  *Id.* at 22.  The ALJ further determined that Plaintiff could not perform her past relevant work, but she could perform jobs existing in significant numbers in the national economy, such as the representative occupations of kitchen helper, counter supply worker, lab equipment cleaner, housekeeper, marker, and labeler.  *Id.* at 27-28.  Accordingly, the

---

of the search box at the top of the page on the ECF toolbar.  The page numbers correspond to the page numbers assigned in the transcript.

ALJ determined that Plaintiff was not entitled to DIB because she was not under a disability.  *Id*. at 29.

Plaintiff filed a request for review, which was denied by the Appeals Council on March 16, 2015.  Tr. at 1-6.  On May 20, 2015, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1.  On August 26, 2015, Plaintiff filed a brief on the merits and on September 24, 2015, Defendant filed her brief on the merits.  ECF Dkt. #s 12, 13.  On October 16, 2015, the parties consented to the jurisdiction of the undersigned.  ECF Dkt. #15.

**II.    RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE**

Since Plaintiff focuses solely on specific mental impairment-related issues in her appeal, the Court sets forth the relevant mental impairment-related evidence related to those issues.

**A.    MEDICAL EVIDENCE**

Plaintiff served in the Navy from 1982-1991.  She received mental health treatment from the VA from 1995 through 2008 for various mental disorders.  Tr. at 732-1011, 1012-1181, 1197-1635. On November 10, 2008, Plaintiff was examined in relation to a compensation and pension examination for mental disorders.  *Id*. at 1197.  Her personal history was noted and her medical history indicated that she received outpatient treatment while in the Navy for depression, bipolar disorder, and PTSD from 1989-1991, 1999-2003, and 2003 through the date of the report.  *Id.* at 1199.  It was further noted that Plaintiff was hospitalized for depression and bipolar disorder in 1988, 1989 and 1999.  *Id*.  She reported that she was currently prescribed Prozac, Abilify and Diazepam, and she was participating in individual and group therapy.  *Id.*

Upon examination, Clinical Psychologist Kelly found that Plaintiff was cooperative, her affect was blunted, her mood was depressed, and she had intact attention and orientation, with no delusions or hallucinations and unremarkable thought process and content.  Tr. at 1200.  She found that Plaintiff reported obsessive/ritualistic behavior as she reported that she checked and rechecked the alarm on her house and she had panic attacks.  *Id*. at 1201.  There were no suicidal or homicidal thoughts and Plaintiff'*s* impulse control was noted as good.  *Id*.  The Beck Depression Inventory -II and PCL-M were administered and results showed that Plaintiff had moderate PTSD symptoms associated with military sexual trauma and moderate depressive symptoms associated with bipolar

disorder.  *Id.* at 1202.  It was believed that Plaintiff was not capable of managing her financial affairs as it was noted that Plaintiff had an attorney custodian for her finances.  *Id.*

Plaintiff was diagnosed with bipolar disorder and PTSD and it was opined that based upon Plaintiff's presentation at the examination, she was not able to work on a daily basis.  Tr. at 1204. It was further noted that although she did not appear to have improved in her conditions, she had not been consistent in seeking treatment.  *Id.*

On May 8, 2009, Plaintiff requested that her fiduciary be removed so that she could manage her own money.  Tr. at 1190.  She explained that her brother had talked her into doing so when she was in a depressed mood, but he then stole from her and used the money to buy drugs.  *Id.*  She then obtained a lawyer appointed by the VA as her fiduciary.  *Id.*  Plaintiff reasoned that she had been in a stable mood for the past two years and learned a lot about how to manage her illness.  *Id.*  She reported compliance with her medications and was able to stop her compulsive spending.  *Id.*  She also reported that she was playing tennis on a daily basis for exercise and it stabilized her mood. *Id.* Licensed Social Worker Szymanski found that Plaintiff was logical and coherent in her cognition and she scheduled Plaintiff to meet with Dr. Menyhert, a neuropsychologist, for an evaluation as to whether she could manage her own funds.  *Id.*

On May 20, 2009, progress notes from Plaintiff's therapy session indicate that she showed mild but significant improvement in her mood and affect, "with a sense that her deep depression has been lifting." Tr. at 1188.  Dr. Menyhert, a neuropsychologist, noted that Plaintiff was aware of her income and expenses and she was beginning the steps to obtain release from her VA guardianship so that she could regain control of her finances.  *Id.*  Dr. Menyhert explained that Plaintiff requested the guardianship at the urging of her brother in 2005, although her brother ended up stealing from her and used her money to buy drugs.  *Id.*  Plaintiff explained that she would not have sought a guardianship had her brother not suggested it as the best thing for her.  *Id.*  Plaintiff reported that she was feeling more stable on her current medications and had not had a significant manic period in 3 to 4 years.  *Id.*  She reported playing tennis again and made it into the semi-finals in a competitive league.  *Id.*  Dr. Menyhert diagnosed moderate bipolar disorder, moderate depression that was improving, and PTSD.  *Id.*  She found Plaintiff competent to manage her own VA benefits.  *Id.*

On July 13, 2009, Ms. Szymanski evaluated Plaintiff again. Tr. at 1191. Plaintiff reported that her mood was stable, she had not had a manic episode in years, and her depressive episodes were brief and much less intense. *Id*. She was also compliant with her medications. *Id*. Ms. Szymanski recommended that Plaintiff be able to manage her own VA disability funds due to her behavior over the last two years. *Id*. at 1193.

On July 27, 2009, Ms. Szymanski wrote a letter to the VA reporting that Plaintiff had asked that her fiduciary be removed because she had been stable for the last two years and could manager her own affairs. Tr. at 1187. Ms. Szymanski noted that Dr. Menyhurst confirmed Plaintiff's representation and she indicated that removing the fiduciary may assist Plaintiff in maintaining her coping skills that she had developed over the past two years. *Id*.

On October 27, 2009, Dr. Wood, Ph.D., performed a compensation and pension examination of Plaintiff for the VA. Tr. at 1182. He noted that Plaintiff was cooperative, with unremarkable speech and psychomotor activity, a blunted affect and a normal mood, although he noted that she maintained a "fixed-and-somewhat-vacant stare." *Id*. He found her attention and orientation to be intact, an unremarkable thought process, no delusions or hallucinations, average intelligence, and fair judgment and insight. *Id*. at 1183. He answered "no" to whether Plaintiff had obsessive/ritualistic behavior or panic attacks, and he found no presence of suicidal or homicidal thoughts. *Id*. He diagnosed bipolar disorder, most recent episode depressed, in partial remission, and PTSD. *Id*. at 1184. He rated her global assessment of functioning as to the bipolar disorder alone at 40, indicative of serious symptoms. *Id*. He opined that Plaintiff's "psychiatric/behavioral status is simply too fragile to expose to the pressures of a standard work setting. The likelihood she would decompensate approaches certainty." *Id*. at 1184. He found Plaintiff competent to handle her own financial affairs. *Id*. at 1183.

On July 2011, Plaintiff underwent a mental health consultation after presenting to seek counseling and treatment in Ohio after moving from Georgia. Tr. at 310. She was reporting a lot of anxiety and stress relating to moving. *Id*. at 310-311. She reported that her medications were working but she needed to start getting medications in Ohio. *Id*. at 311. She indicated that she was

renting her own place and was financially stable with her 100% disability benefits. *Id.* at 312.  She also reported that she liked to play tennis and played in a tournament the past week and she liked to attend church.  *Id.*  She continued to have nightmares from being raped while in the Navy and tended to avoid people, be hypervigilant and had trouble going to sleep. *Id.* at 314.  Plaintiff was diagnosed with anxiety disorder, bipolar disorder, and major depression. *Id*. at 315.  Her GAF was rated at 55, indicative of moderate symptoms and she was referred for treatment and medication management *Id.* Clinical social worker Winkler found Plaintiff alert, attentive and oriented, with normal speech, congruent affect and thought process, no hallucinations or delusions, no suicidal or homicidal ideations, good insight and judgment and intact memory. *Id*. at 314.

On December 19, 2011, Clinical Nurse Specialist ("CNS") Walton met with Plaintiff, who wanted to reduce her depression and PTSD symptoms. Tr. at 652.  He diagnosed her with bipolar disorder not otherwise specified and PTSD and he rated her GAF at 60, indicative of moderate symptoms. *Id.* at 653.  She reported feelings of sadness, discontent, isolation, fear of relationships and flashbacks of trauma. *Id.*  He continued Plaintiff's medications of Prozac, Abilify and Valium after finding that her concentration was good, her sleep was fair and her  appetite, motivation, and energy levels were fair. Tr. at 655.  Plaintiff was alert, attentive and oriented, with normal speech, a mildly depressed mood, congruent affect, normal thought process, no hallucinations or delusions, no suicidal or homicidal ideations, and limited insight and judgment and intact memory. *Id*.  at 656.

On March 21, 2012, CNS Walton met with Plaintiff, who indicated that she wanted to control her depression and insomnia. Tr. at 606.  She reported that she had a 100% service-connected disability with the VA for bipolar disorder. *Id*.  She indicated that she had no manic episodes and few depression symptoms on the medications that she was taking, but she had some continuing PTSD symptoms, avoidance behaviors, hypervigilance, trouble falling asleep and occasional nightmares, even with the medications. *Id*.  Plaintiff reported that she played tennis three times per week for exercise and was active in her church, but she still felt isolated. *Id.*  She requested that her medications be continued because she felt that they were working. *Id*.  CNS Walton noted that Plaintiff was taking Prozac, Abilify, Remeron, and Valium. *Id*. at 607.

CNS Walton found that Plaintiff's concentration was good, her sleep was fair and her appetite, motivation, and energy levels were fair.  Tr. at 607.  Plaintiff was alert, attentive and oriented, with normal speech, a mildly depressed mood, congruent affect, normal thought process, no hallucinations or delusions, no suicidal or homicidal ideations, and limited insight and judgment and intact memory.  *Id.* at 607-608.  CNS Walton diagnosed bipolar disorder not otherwise specified, personality disorder, and PTSD.  *Id.* at 609-610.  He rated her GAF at 66, indicative of mild symptoms and he continued the Prozac, Abilify and Valium, but discontinued the Remeron. *Id.* at 608.

On June 22, 2012, CNS Walton met with Plaintiff for mental health follow up and medication management and she reported continuing problems with her adult son who lived with her and her adult daughter who was most likely going to move in with her. Tr. at 573.  She stated that her depression was well-controlled and her anxiety was the problem, as well as some PTSD symptoms.  *Id.*  She reported avoidance behaviors, and an occasional nightmare even with the medications.  *Id.*  She played tennis to keep her weight down and to keep her mind occupied.  *Id.* She indicated that her medications were working except for her recent anxiety increases.  *Id.* Plaintiff's concentration was good, her sleep was good with medications, and her appetite, motivation, and energy levels were fair.  *Id.*  Plaintiff was alert, attentive and oriented, with normal speech, a mildly anxious mood, congruent affect, normal thought process, no hallucinations or delusions, no suicidal or homicidal ideations, and limited insight and judgment and intact memory. *Id.* CNS Walton diagnosed bipolar disorder not otherwise specified and chronic PTSD due to military sexual assault.  *Id.* at 576. He continued her medications, but increased her Valium prescription to 5mg daily for anxiety.  *Id.* at 577.

On July 20, 2012, CNS Walton met with Plaintiff for mental health follow up and medication management and she reported continuing problems with her adult children who were living with her. Tr. at 566.  She stated that her depression was well-controlled and her anxiety was better after raising her Valium prescription, but she still had some PTSD symptoms.  *Id.*  She reported avoidance behaviors, and played tennis to keep her weight down and to reduce her stress.  *Id.*  She indicated that her medications were working better with the changes made to them.  *Id.*  Plaintiff's

concentration was good, her sleep was good with medications, and her appetite, motivation, and energy levels were fair.  *Id.*  at 560.  Plaintiff was alert, attentive and oriented, with normal speech, an euthymic mood, congruent affect, normal thought process, no hallucinations or delusions, no suicidal or homicidal ideations, limited insight and judgment, and intact memory.  *Id*. CNS Walton diagnosed bipolar disorder not otherwise specified and chronic PTSD due to military sexual assault. *Id*. at 570. He rated her GAF at 58, indicative of moderate symptoms.  *Id*.  He continued her medications.  *Id*.

On August 22, 2012, CNS Walton met with Plaintiff for mental health follow up and medication management and she reported that she was feeling more stressed as she was continuing to deal with problems with her adult children who were living with her.  Tr. at 559.  She stated that her depression was well-controlled and her anxiety was better, but she still had some PTSD symptoms.  *Id*.  She reported avoidance behaviors, no social life, fear of establishing a new relationship and having no friends except for the women in her tennis community, with whom she only played tennis and did not socialize. *Id*.  She indicated that she played tennis three times per week, her sleep was good and she had no racing thoughts, hallucinations or hypomanic behaviors. *Id.*  Plaintiff's concentration was good, her sleep was good with medications, and her appetite, motivation, and energy levels were fair.  *Id.*  at 560.  Plaintiff was alert, attentive and oriented, with normal speech, a mildly anxious mood, congruent affect, normal thought process, no hallucinations or delusions, no suicidal or homicidal ideations, limited insight and judgment, and intact memory. *Id*. CNS Walton diagnosed bipolar disorder not otherwise specified and chronic PTSD due to military sexual assault.  *Id*.  at 563. He rated her GAF at 58, indicative of moderate symptoms.  *Id*. He continued her medications.  *Id*. at 564.

On September 24, 2012, Plaintiff met with CNS Walton for medication management and she reported that her depression was well-controlled and her anxiety was better, but she still had some PTSD symptoms.  Tr. at 534.  She reported avoidance behaviors, no social life, fear of establishing a new relationship and having no friends except for the women in her tennis community.  *Id*.  She indicated that she played tennis three times per week, her sleep was good and she had no racing thoughts, hallucinations or hypomanic behaviors.  *Id.*  Plaintiff's concentration was good, her sleep

-8-

was good with medications, and her appetite, motivation and energy levels were fair.  *Id.*  Plaintiff was alert, attentive and oriented, with normal speech, an euthymic mood, congruent affect, normal thought process, no hallucinations or delusions, no suicidal or homicidal ideations, limited insight and judgment, and intact memory.  *Id.* at 537.  CNS Walton diagnosed bipolar disorder not otherwise specified and chronic PTSD due to military sexual assault.  *Id.*  at 538. He found that Plaintiff was less anxious but still struggling to set boundaries with the adult children living with her.  *Id.*  He continued her medications.  *Id.*

On November 6, 2012, Plaintiff had a mental health follow up with medication management and she reported that she was having problems with her son who was having legal problems.  Tr. at 526.  She indicated that her depression was well-controlled, she was not suicidal, her anxiety was in better control, and although she still had PTSD symptoms, she stated that the medication combination was "the best I have had."  *Id.*  She reported avoidance behaviors, no social life, fear of establishing a new relationship and having no friends except for the women in her tennis community.  *Id.*  She indicated that she played tennis three times per week, her sleep was good and she had no racing thoughts, hallucinations or hypomanic behaviors.  *Id.*  Plaintiff's concentration was good, her sleep was good with medications, and her appetite, motivation, and energy levels were fair.  *Id.* at 527.  Plaintiff was alert, attentive and oriented, with normal speech, an euthymic mood, congruent affect, normal thought process, no hallucinations or delusions, no suicidal or homicidal ideations, limited insight and judgment, and intact memory.  *Id.* at 530.  CNS Walton diagnosed bipolar disorder not otherwise specified and chronic PTSD due to military sexual assault.  *Id.*  He found that Plaintiff was less anxious but still struggling to set boundaries with the adult children living with her.  *Id.*  He continued her medications.  *Id.* at 531.

Plaintiff continued to have medication management and follow up visits with CNS Walton and CSN Kendall throughout 2013.  Plaintiff reported during this time that she was playing tennis three times per week and attending church three times per week.  Tr. at 348, 365, 388, 397, 420, 451. She also reported that she had been on a few dates.  *Id.* at 388.  She was fearful of establishing a new relationship.  *Id.* at 508.  She reported sleeping and eating well.  *Id.* at 348, 368, 388.  Mental status examinations during this time generally showed that Plaintiff had fair to good concentration, normal

speech, an euthymic mood, a congruent affect, appropriate but sometimes paranoid thought processes, no hallucinations, intact memory and fair to good insight and judgment. *Id.* at 340, 344, 348, 352, 365, 368, 388-389, 392, 397, 401, 409, 413, 424, 452, 508, 510.  She also denied any medication side effects. *Id.* at 343, 351, 367, 391, 400, 412, 423, 510. *Id.*  Plaintiff's GAF scores were between 40 for serious symptoms to 66 for mild symptoms. *Id.* at 352, 369, 393, 402, 414, 425, 454, 506, 511.  Diagnoses were stable bipolar disorder NOS and stable PTSD. *Id.* at 352, 393, 401, 414, 424, 511.

On July 16, 2013, Plaintiff had a mental health follow up and medication management visit. Tr. at 324.  Her concentration was fair, with her reporting that she had more concentration than she used to, she was taking piano lessons, playing tennis longer than she used to, and planned to play piano at her church. *Id.*  She also indicated that her sleep and appetite were good, her motivation and energy levels were good, she taught Sunday school and attended church three times per week. *Id.* at 325.  Plaintiff denied any side effects from her medications. *Id.* at 327.

Clinical Nurse Specialist Kendall found Plaintiff to be cooperative, with normal speech, an euthymic mood, congruent affect, normal thought process, no hallucinations or delusions, no suicidal or homicidal ideations, some paranoid ideation, good insight and judgment and intact memory.  Tr. at 328.  She diagnosed moderate bipolar disorder and rated Plaintiff's GAF at 50, indicative of moderate symptoms. *Id.*  Plaintiff's medications were continued. *Id.* at 329.

### B.       TESTIMONIAL EVIDENCE

At the hearing before the ALJ, Plaintiff testified that she was 50 years old and lived alone as her adult son had moved out eight months ago.  Tr. at 43.  She went to college for over one year and last worked part-time in 2007 giving tennis lessons to kids. *Id.* at 44.  Plaintiff explained that she did not finish her college degree because it was too stressful for her. *Id.* at 55.  She further testified that before that, she worked part-time as a teacher's aide and had worked full-time at a law office filing motions for foreclosures. *Id.* at 45.  She explained that the law job had ended because it was  too stressful for her and she was admitted into the hospital within the month of leaving the law office. *Id.* at 45-46.

The ALJ asked Plaintiff about her enjoyment of playing tennis and she responded that she had been playing everyday or three times a week in a women's doubles tennis league, but she was now playing once or twice per week.  Tr. at 46.  She said that she did not make friends as she did not care for people.  *Id*. at 51.  She indicated that she had no other hobbies.  *Id*.

The ALJ asked about Plaintiff's prior hospitalizations for her mental conditions and she discussed those hospitalizations and informed the ALJ that she has taken her medications as prescribed for the past few years.  Tr. at 49.  She described a typical day as waking up at 5 a.m., and showering once or twice per week because it was too difficult to shower more often.  *Id*. at 50.  The ALJ asked whether Plaintiff showered more often when she was playing tennis three times per week and she responded that she did not.  *Id*. at 50.  She reported that she went grocery shopping, she paid her daughter to clean her house, and when her son was living with her, he would cook as it was overwhelming for her to cook.  *Id*. at 52.  She attends church every week and joined the church choir to play piano.  *Id*.  She also takes piano lessons every Monday.  *Id*. at 53.

When asked why she felt that she was disabled, Plaintiff responded that there were a lot of things that she needed to do and could not do, such as taking care of her hygiene and cooking, and thus she could not perform the functions of work if she could not perform these basic functions.  Tr. at 54.  She noted that the VA diagnosed her with major depressive disorder and bipolar disorder. *Id.* at 56.  She explained that in the manic phase of bipolar disorder, which she suffers for about three weeks per year, she becomes promiscuous, she spends a lot of money, and she functions on very little sleep.  *Id.*  She testified that the medications have helped with the manic episodes.  *Id*. As to the depressive episodes, which she suffered the rest of the year, she cannot get out of bed and at most she will get of bed to go get a cappuccino at Speedway.  *Id*. at 57.  She would even miss her tennis matches.  *Id*. at 58.

Plaintiff also testified that even with the medications, she still suffers from hallucinations, as she will hear people knocking on her door and she hears voices that tell her to hurt herself.  Tr. at 59.  She indicated that she has told her doctors and they have adjusted her medications, including increasing her Valium dosage and changing her mood stabilizer.  *Id*. at 60.  She explained that when other people are around her, she has paranoid thoughts about them, thinking that she will hurt them

-11-

because she has to protect herself as there have been murders and crime where she lives and she lives alone.  *Id.* at 64-65.  She stated that she takes 22 medications in the morning and 17 at night.  *Id.* at 63.  She also testified that she has nightmares and flashbacks from when she was raped in the Navy by a chief warrant officer.  *Id*. at 66.  She has missed weeks of church because of her depression and because she wants to limit her contact with people.  *Id*. at 67.  She stopped teaching Sunday school three months after it started and she sometimes goes to church choir practice.  *Id*. at 68-69.  She also reported that she cries uncontrollably a couple of times per week.  *Id*. at 68.

    The VE then testified.  The ALJ asked the VE to assume a hypothetical individual with Plaintiff's age, education and background that can perform all exertional functions of work except that she can understand, remember and execute simple instructions, make judgments on simple work, respond appropriately to usual work situations and changes in a routine work setting with few unexpected changes, she is precluded from high production quotas, such as piecework, assembly line work and strict time requirements, she is precluded from arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others, and she can interact with others on trivial matters, meaning dispensing and sharing factual information not likely to generate an adversarial setting.  Tr. at 73.  The ALJ responded that such a hypothetical individual could perform jobs existing in significant numbers in the national economy, such as the representative jobs of kitchen helper, supply worker, and laboratory equipment cleaner.  *Id*. at 73-74.  He also identified the jobs of housekeeping cleaner, marker, and labeler.  *Id*. at 74.

    The ALJ asked about ordinary breaks in the jobs during the workday, and the VE responded that workers typically receive one 15-minute break in the morning and in the afternoon, and a half-hour lunch break.  Tr. at 74.  The ALJ asked about absenteeism tolerance, and the VE responded that an employer tolerates ten or less days of absenteeism per year.  *Id*. at 74-75.  The ALJ also asked about a production benchmark and the VE responded that being off task at or above 10% is work preclusive.  *Id*. at 75.

### III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

-13-

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).  When substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir.2001).  Thus, the ALJ has a " 'zone of choice' within which he can act without the fear of court interference." *Id.* at 773.

**V.      ANALYSIS**

**A.      VA DECISION**

Plaintiff challenges the ALJ's finding that he could not give any weight to her VA disability decision finding that she was 100% disabled.  ECF Dkt. #12 at 2-3.  The Court finds that the ALJ committed error in his treatment of the VA disability determination.  .

The social security regulations provide that "[a] decision by ... any other governmental agency about whether you are disabled is based on its rule and not our decision about whether you are disabled or blind." 20 C.F.R. §§ 404.1504, 416.904.  The regulations further provide that such decisions are not binding upon the SSA.  *Id.*  Social Security Ruling 06-03p ("SSR 06-03p") acknowledges these regulations, but clarifies that although other agency decisions may not be binding:

> we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 4 04.1512(b)(5) and 416.912(b)(5)). Therefore, **evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered**.
>
> These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules. We will evaluate the opinion evidence from medical sources, as well as "non-medical sources" who have

-14-

had contact with the individual in their professional capacity, used by other agencies, that are in our case record, in accordance with 20 CFR 404.1527, 416.927, Social Security Rulings 96-2p and 96-5p, and the applicable factors listed above in the section "Factors for Weighing Opinion Evidence."

Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. ***However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases***.

As support for her position that the ALJ erred in failing to give any consideration to her VA 100% disability determination, Plaintiff cites to and discusses *Lowery v. Commissioner of Social Security*, 886 F.Supp.2d 700 (S.D. Ohio 2012), in which the Federal District Court for the Southern District of Ohio held that an ALJ is required to consider such a determination and to articulate one or more reasons for rejecting that determination.  ECF Dkt. #12 at 2, citing and quoting *Lowery*, 886 F.Supp.2d at 717, citing SSR 06-03p.  Defendant counters that *Lowery* is distinguishable because the ALJ in that case "did not consider the VA's disability determination or explain what, if any, weight he gave to that determination."  ECF Dkt. #13 at 10, citing *Lowery*, 886 F.Supp.2d at 717-718.

The Court does not find the instant case much different than *Lowery*.  In *Lowery*, the ALJ acknowledged the VA disability determination, but only stated that the claimant was receiving VA disability benefits.  886 F.Supp.2d at 717.  The ALJ in the instant case did not provide much more than the ALJ in *Lowery*, as in this case, he acknowledged the existence of a VA disability determination, but stated that he could not give any weight to the VA disability determination because such a determination was not binding upon the SSA.  Tr. at 24-25.

The Court finds that more is required and the ALJ erroneously found that he could not consider the VA disability determination because it was not binding upon the SSA.  In *LaRiccia v. Commissioner of Social Security*, 549 Fed. App'x 377, 387 (Dec. 13, 2013), unpublished, the social security claimant argued that the ALJ erred by not crediting or weighing the 100% disability determination by the VA.  The Sixth Circuit acknowledged that no specific standard has been set forth concerning the weight that the Commissioner should give to a VA 100% disability

-15-

determination. *Id.*, citing *Stewart v. Heckler*, 730 F.2d 1065 (6th Cir.1984). The Court further indicated that "the Commissioner may nonetheless find an agency's determination relevant, depending on the similarities between the rules and standards each agency applies to assess disability." *Id.* , citing SSR 06–03p, 2006 WL 2329939, at *7 (August 9, 2006) ("[B]ecause other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency."). Although the Sixth Circuit found in *LaRiccia* that the ALJ's reasons for affording no weight to a 100% VA disability rating were erroneous, it also made clear that SSR 06-03p requires that the ALJ explain the consideration given a VA disability determination. *LaRiccia*, 549 Fed. App'x at 388 ("Although the ALJ provided reasons for the weight afforded the VA disability determination, *as SSR 06–03p requires*, we cannot credit the reasons because they do not accurately reflect the approaches taken in the two systems").

In the instant case, the ALJ clearly did not consider the VA disability determination. He acknowledged the 100% disability determination, but he found that he could not give any weight to it because it was not binding upon the SSA. Tr. at 25. This is contrary to SSR 06-03p and *LaRiccia* which note that a disability decision from another agency may be relevant and require that the ALJ consider the decision even though it is not binding.

Based upon the ALJ's error in not considering the VA 100% disability determination and his erroneous reason for not considering the determination, the Court REMANDS this case to the ALJ for proper and actual consideration of that VA disability determination and explanation of the weight he gives to the VA disability determination with proper reasons.

### B.     TREATING PSYCHOLOGIST AND FINDING OF IMPROVEMENT

Plaintiff also challenges the ALJ's treatment of the opinion of her treating psychologist, Dr. Wood. ECF Dkt. #12 at 3-5. She contends that the ALJ improperly afforded less then controlling weight to the opinion and in fact discounted every opinion in the medical record and substituted his own judgment for the medical opinions. *Id.* Plaintiff also asserts that the ALJ erred in finding that her conditions had improved after May 20, 2009. *Id.* at 2.

-16-

The Court notes that the ALJ afforded less than controlling weight to the opinion of Dr. Wood. Tr. at 23. However, he did not indicate the weight that he did attribute to this opinion. Further, the ALJ gave no weight to the GAF scores and he gave no weight to the opinions of the state agency medical source opinions. *Id.* at 23-24. He also gave no weight to the VA disability determination, as explained above. *Id.* at 24-25. The ALJ appears to rely upon objective medical findings and Plaintiff's credibility in denying her disability benefits.

In affording less than controlling weight to Dr. Wood's opinion, the ALJ first noted Dr. Wood's opinion that Plaintiff's "psychiatric/behavioral status is simply too fragile to expose to the pressures of a standard work setting. The likelihood she would decompensate approaches certainty." *Id.* at 23, quoting Tr. at 1184. The ALJ reasoned that he gave less than controlling weight to Dr. Wood's opinion because it did not address Plaintiff's ability to work in a low-stress setting such as the one that the ALJ provided in his mental RFC for Plaintiff. Tr. at 23. The ALJ also pointed out that Dr. Wood found upon examination of Plaintiff on the same date that he wrote the opinion that Plaintiff's psychomotor activity and speech were unremarkable, she was cooperative despite her blunted affect, and while she had a "somewhat-vacant stare," he found her mood to be within gross normal limits, her attention and memory were intact, she had no delusions or hallucinations and she reported that her sleep was normal and she denied having manic episodes during recent years. *Id.* at 23-24, citing Tr. at 1182-1184. The ALJ also explained that Plaintiff's daily activities of playing competitive doubles tennis reflected that Plaintiff was not as fragile as Dr. Wood had opined. *Id.* at 24.

The Court notes that the ALJ's error in failing to consider the VA disability determination precludes a determination on whether the ALJ erred in his treatment of the Dr. Wood's opinion and on the issue of whether Plaintiff's condition improved. The ALJ's actual review and consideration of the VA disability determination and the medical evidence used to support the determination may have an impact on the ALJ's consideration of Dr. Wood's opinion and the improvement issue. The Court points out, however, that the ALJ must indicate the weight that he actually gives to Dr. Wood's opinion in conjunction with considering the proper regulatory factors.

## VI.    CONCLUSION

For the foregoing reasons, the Court REVERSES the decision of the ALJ and REMANDS the instant case for the ALJ to actually consider the 100% service-connected disability decision of the VA and to then subsequently reconsider and explain his decision concerning the weight, if any, to give to Dr. Wood's opinion and to reconsider his decision as to whether Plaintiff's conditions had improved since May 20, 2009.


DATE: September 8, 2016                     _____*/s/George J. Limbert*_____
                                            GEORGE J. LIMBERT
                                            UNITED STATES MAGISTRATE JUDGE